Case No. 15-1064, Great Lakes Comnet, Inc. et al. Petitioners v. Federal Communications Commission et al. Mr. Olive for the petitioners, Ms. Sundet Reason for the respondent, and Mr. Hunt Sider for the intervener. Good morning, Your Honors, and may it please the Court. Great Lakes Comnet is currently in Chapter 11. It has not been paid by AT&T nor any of the other intervening inter-exchange carriers since early 2012. It is forced to continue to provide those services to them because it cannot lawfully block or refuse to take that service. In the bankruptcy proceeding, it contends that AT&T owes it approximately $22 million. The amount that it claims to be owed by the other IXCs is roughly equal to that amount. Under the order that is under appeal today... Excuse me, but does that affect the issue before us today? Well, whether or not Great Lakes is entitled to charge those rates and collect them is implicit in the order before you today. Right, I understand that, but the fact that it's in bankruptcy is not relevant to the issue we have, right? Not directly, no, Your Honor. Your point is it really needs the money. It needs the money, there's no question about that. Under the order under appeal today, by July 2018, at the latest, when AT&T Michigan is required under the Connect America Fund to transition its access rates to zero under the Bill and Keep regime, the order under appeal today forces Great Lakes to also reduce its rates to zero as well. But why is that a question? Isn't the only question before us the legality of the rates during the period at issue in this case? What does the future Bill and Keep arrangement have to do with the issue before us? Because the FCC's adoption of the Bill and Keep regime is the overall regulatory framework in which this Court has to understand and interpret... the rates at issue in this case. The full portions of it are the transition to Bill and Keep is in steps over time. The ultimate transition to Bill and Keep where rates go completely to zero is in July 2018 or earlier, because any IXC can transition earlier than that time. Getting to the immediate impact, the first issue I'm going to deal with is out of the order that we deal with in our briefs, which is that if Great Lakes is a CLEC, a competitive LEC, which we contend it is not, then it is clearly a rural CLEC under the unequivocal definition of rural CLEC contained in Rule 6126A.6. The rule is absolutely clear and unequivocal. A rural CLEC is a CLEC that does not serve, i.e., originate or terminate traffic to end-users in an urban area. It's undisputed that Great Lakes does not originate or terminate traffic to end-users in an urban area. Well, if you're wrong about the end-user argument, then what? Suppose you're wrong. Your basic argument is Great Lakes doesn't serve end-users, therefore it's not a CLEC. But suppose you're wrong about that. The Commission says by definition there are end-users all over the country using this 800 service, and some of them must be in urban areas. That's not the standard in the rule. The rule is do they serve, do you serve end-users directly? Wasn't that rejected in the ACE order and in the regulation that followed the ACE report? No, we don't believe it did, Your Honor. And here specifically talking about serving the rural exemption. My question was, I think Judge Wilkins and I are both asking the same question. If you're wrong about the end-user point. Then we're still correct about being a rural CLEC. How can that be? Because if the FCC were to prevail in its argument that service to any customer, and every call goes to some end-user at some point, that if calls are originating or terminating with an end-user in an urban area somewhere, then there is no rural exemption. The rural exemption is null and void. Because a purely rural telephone company that serves only end-users directly in rural areas still gives those customers the ability to receive calls from or place calls to an urban area through another carrier. So to use an old example, if the phone rings in Mayberry and Sheriff Taylor picks up the phone and it's the operator Sarah excitingly saying there's a long-distance telephone call from the state police in Raleigh, that does not render the Mayberry Telephone Company a non-rural telephone company serving only Mayberry. I thought that the regulation looked at, to the extent that it looked at end-users, it looked at the end-user who originated the call. Well, the definition in the rule is does it originate or terminate? Go ahead. But in the footnote of the order where the commission spells out its rationale, it says the wireless traffic by its very nature originates from locations throughout the country. So as Judge Wilkins was saying, the focus is on where the calls, the end-user originate, not the other end of the call. That's an observation that the FCC made in the footnote, but as I point out, that means there is no rural exemption because every telephone company, even the smallest rural telephone company, gives its customers the ability to receive calls from an urban area through another carrier. But I thought it was where the calls originate. So if it's a company that only deals with customers who originate calls from rural areas, then wouldn't that qualify? No. Because? Because they're saying if you are receiving calls from an urban area, then you're not entitled to the rural exemption. So in my example, if the state police in Raleigh call Sheriff Andy Taylor in Mayberry, the FCC is saying to the Mayberry Telephone Company, you are not entitled to the rural exemption. Even though you don't serve Raleigh, all your customers are in Mayberry and maybe a few in Mount Pilate. Just so that I'm clear, the way that these regulations work, you can't be a rural SELEC for some purposes and a non-rural SELEC for other purposes. You're either one or the other. For purposes of this particular rule, that is correct. But, Your Honor, there are definitions of rural telephone company contained in the Federal Telecommunications Act. There are also definitions of local exchange carrier contained in the Communications Act and of incumbent local exchange carrier contained in the Communications Act. The FCC, in promulgating Rule 6126, decided it did not want to follow those definitions. And specifically, initially, as it admits, the initial version of Rule 6126 adopted in 2001 was intentionally intended to exclude any intermediate carriers even if they were otherwise local exchange carriers under the Communications Act. Can I get one point of clarification? So if we're not talking about intermediate carriers, so maybe I've got the technology wrong, but if we're not talking about intermediate carriers who are one level up, but we're talking about a carrier who only directly serves end users? Yes. Are you saying it's impossible to have a carrier that only directly serves end users, all of whom are located in rural areas? That is correct. It's impossible. Well, given what the FCC has said in this order, a rural telephone company that is serving only end users in a rural area is still not entitled to the rural exemption because someone in the city could pick up a telephone and call that rural telephone company, call someone living in that service area. But with respect to those rural customers, the SELAC is only originating or terminating calls to them. They're all rural. That's correct. Okay, so they meet the standard. Well, that's not what the standard says. Okay, well. The standard says nothing about the carrier being required to serve anyone. It's stated in the negative that you do not serve directly by originating or terminating calls in an urban area. I guess what I'm not understanding, and I'm not sure if this is the same question Judge Tatum was just asking, but let's suppose you are serving end users in Mayberry. Yes. And you get a call from New York City. Yes. You are terminating that call, right? You're terminating the call in a rural area. In a rural area. Yes. Okay, so Mayberry calls back to New York City. So you are the SELAC and you are originating that call. That's correct. It's being terminated in New York City, but it's not being terminated by you in New York City, right? That's correct. So if that's all you're doing, why aren't you still a rural SELAC? Because you're not terminating that call in an urban area. Because in the first example you gave, this FCC order says Gray Lakes does not qualify as a rural SELAC because a call originated in New York that it handled. Okay. Maybe that's in the unique circumstance where you are not serving end users, but you're being this intermediate. I mean, why should there be, I guess I'm not understanding. I mean, it just seems like that's part of what you sign up for when you agree to be an intermediary. If there are policy reasons to say to intermediaries in that circumstance that if you're an intermediary, you cannot qualify for the rural exemption, then that is something to be addressed in a rulemaking proceeding on a going forward perspective basis only. But that is not what this rule says by any stretch of the imagination. It's not what is in the language of the rule. It can't be reasonably inferred from the rule. And the FCC's arguments in its order that either because Gray Lakes owns some lines that are in urban areas, that it serves, that's contrary to the language of the rule that says service means originating or terminating. But wasn't there a second part of that footnote where they said moreover? Correct. The second part is and some of these calls originated in urban areas. Actually, some of them probably. There are two 800 numbers. Presumably some of them terminated to urban areas as well, wherever the 800 center was. Can I ask you a technical question about these 800 calls? Yes. I don't think my question has anything to do with the legal issue. I just don't understand this business. If I use my cell phone to call an 800 number and if I have an unlimited package, it's not going to cost me anything even if it's an 800 number, right? That's correct. But if I do have limited, it will still cost me even though it's an 800 number, correct? Just explain to me why would a business pay for 800 service from cell phones? What are they getting for it? The way the 800 service works is that if I'm running a service center to take calls for 800 numbers, I pay AT&T or pay one of the IXCs to provide me 800 service, and I pay for that service at a negotiated rate. The RAC rate is roughly $1 a minute. And so when I, as a customer, am trying to call that service center, the 800 center is paying for the cost of that call. But the cost— And that's what it's paying for. If I make—if I call my bank's 800 number on my cell phone, it doesn't cost me anything. So why would the bank pay for it? What's the bank paying for? It's just receiving the call. The bank is paying for receiving the 800 service. You're not paying a per-minute charge on your cell phone for calling that long-distance number because the cost of providing the cellular service is buried into your monthly rate. Right. So the 800 service— I mean, if I call from my landline, I get it. I won't get a charge on my phone. I won't get a long-distance charge. That's correct. So I understand why my bank wouldn't want to pay for that call. But I don't understand why they would pay for it. On your local cell phone provider, I mean, when you make a place to call on your cell phone, it goes from your phone to a tower and then connected to a central office. And then if it's a long-distance call, it's then going to go over a long-distance carrier. I believe the situation then is that your cellular carrier is not having to pay AT&T for the long-distance service to then take that call to the call center. I see. The call center is paying for them doing that. I'll reserve the remainder of my time for rebuttal here. Okay. Thank you. Good morning. May it please the Court. My name is Thaila Sundaresan, and I represent the Federal Communications Commission. The basic issue in this case is that Great Lakes seeks a blanket exemption to the benchmark rule on grounds that it is not a competitive local exchange carrier or CLEC. But over a decade ago, in its eighth report in order, the Commission stated clearly that it was adopting a new rule for intermediate carriers. The Commission determined, and I quote, the rates that a competitive LEC charges for access components when it is not serving the end user should be no higher than the rate charged by the competing ILEC. In other words, intermediate carriers that do not directly serve end users, like Great Lakes, are subject to the benchmark rule. Can you address the rural CLEC question?  As I understand your response to their argument, it's that their argument can't be right, because if their argument was right, then every intermediate carrier would be rural. And that seems absurd. As I understand your position, as the Commission's position, at least in footnote 96 of the order, it seems to suggest that no intermediate carrier can be a rural CLEC because the Commission said the rural exemption does not apply to carriers that serve no end users whatsoever, which would be every intermediate carrier. That's correct, Your Honor. 6126F is the applicable provision for intermediate carriers that do not serve end users. Intermediate carriers cannot qualify for the rural exemption in 6126E. And we say that in footnote 96. The rural exemption does not apply to carriers that serve no end users whatsoever. So no intermediate carrier can ever qualify. And I guess what seems to be the step that at least may or may not be on the face of the regulation is that the rural CLEC regulation only applies to entities that serve end users. And then you go, if that's an assumption that's embedded in the regulation, then one would go on and see, well, okay, then the only ones that can qualify to be rural are those that serve no urban users. But that assumption, that's what I'm wondering. That assumption is stated in the footnote, to be sure, in the order. But where would I know that the only entities that could conceivably fit within the rural CLE are those that serve end users at all to begin with? So, Your Honor, I would point you to the plain language of 6126E, which begins with except as provided in paragraph G of the section and notwithstanding paragraphs B through D of the section. What that means is that the notwithstanding B through D language means that the rural exemption is an exclusion from the general benchmark rate in B through D, but it does not say notwithstanding paragraphs B through D and F. E pointedly excludes F. So, from that language, it can be deduced that intermediate carers cannot qualify for the rural exemption. I'll also add that when the commission added... The order, by the way, doesn't say that, does it? I'm sorry? The order we're reviewing doesn't say that. The order does not explicitly say that, Your Honor. It doesn't say it at all. It does not say that. It gives two reasons, one of which is clearly wrong, right? That Great Lakes doesn't qualify because it has equipment in Chicago. That can't be right. Your Honor, the... The other reason is where its end users are. But you're telling us that a rural, an intermediate COAC can't ever qualify, right? That's correct. Intermediate carers cannot qualify for the rural exemption. The analysis included in the order, there are two points. One is that they cannot, that Great Lakes cannot qualify because they handle traffic from end users nationwide, including urban areas. And they have transport facilities in urban areas, including Chicago and Detroit. And in the eighth report and order, we say that the rural exemption should be determined based upon the availability of the entire service area. And we don't define what service area means, but it was reasonable for the commission to conclude that because Great Lakes service is transporting traffic, they don't operate lines that serve end users, it would make sense to look at the location of their transport facilities. That's the service they provide. It's transporting traffic. So it was reasonable for the commission to conclude that because their transport facilities were located in urban areas, they could not qualify for the exemption. That's consistent with the reason why the exemption was crafted back in 2001. It was always designed to be an extremely narrow exemption that should apply to only a small number of carriers. The commission didn't need to say any of that if it's true that intermediate carriers per se can't qualify for the rural exemption, right? Then none of the other stuff matters. And as I, that seems to me to be the critical first step. But tell me if I'm wrong. That seems to me to be the critical first step. And that's embedded in footnote 96 where you say where the commission said but the rural exemption does not apply to carriers that serve no end users whatsoever. It's buried in a footnote, and it doesn't specifically then go on to say that means, by the way, no intermediate carrier can ever qualify for the rural exemption. But that's what you're saying that that footnote means. I would also point you to JA9 paragraph 25 where we say that the applicable provision for intermediate carriers that do not have their own end users is 6126F. So that's also another citation to the order where we make clear that 6126F is the only applicable provision for intermediate carriers. So could you have stopped right there then? Because if it's true that no intermediate carrier can ever qualify under the rural exemption, then it doesn't matter where transit facilities are located. It doesn't matter where calls originate. We're done. That's true, Your Honor. The first step is are they an intermediate carrier? If the answer to that is yes, then 6126E does not apply. However, the commission wanted to provide additional analysis on the location of the urban areas. Well, maybe I was just going to ask the question you're going to ask. We review, I mean, we're reviewing the decision that's before us. The decision that's before us doesn't say what you just said. It says it turns on where their facilities are and where the end users are. It doesn't say that intermediate CLECs cannot qualify. We've made that argument here. So what do we do as a reviewing court? Don't we have to send it back to the commission to see if the commission agrees with what you've told us today? No, Your Honor. I would point you back to footnote 96, JA9, where we say the rural exemption does not apply to carriers that serve no end users. And that language makes clear that intermediate carriers that don't have end users cannot qualify for the rural exemption. Okay. All right. But it's just that language does appear to say that. I mean, I have to say I don't think your brief says that. I didn't even understand this until today. It's just something that was divined from the footnote. But your brief never makes that point explicitly. Your brief talks about the location of transit facilities and then secondarily where calls originate. The brief does say that 6126F is the applicable provision for intermediate carriers. Yes, that's true. But then it doesn't go on to make what seems to me to be a pretty important point, which is that the upshot of focusing on 6126F is that no intermediate carrier can ever qualify for the rural exemption, which is if you read footnote 96 very carefully, maybe you come to that conclusion. You're telling us that that is in fact the conclusion that emerges from that footnote. But neither the brief nor the order specifically say that. And then the order, I think in some sense, might complicate matters by then going on to explain other criteria that tell us why this particular CLEC doesn't qualify for the rural exemption when we're already out of that box to begin with. Yes, Your Honor. The brief doesn't explicitly make that argument that 6126E doesn't apply. But if you look at the language of the order in footnote 96, the only conclusion, and perhaps it could have been stated more explicitly, but the only conclusion is that intermediate carriers that do not have end users cannot qualify. Period. They can't. That's the position that you have now. That's correct. Just to be clear. Okay. All right. That's helpful. Your Honor, I want to turn to the threshold matter, which is whether or not Great Lakes is a CLEC. I would point you to the plain language of 6126A1. The only part of the definition that's in dispute between the parties is whether Great Lakes, quote, provides some or all of the interstate exchange access services used to send traffic to or from an end user. And Great Lakes comfortably falls within this definition. According to its own tariff, they provide some interstate exchange access services, and these services are in turn used to send traffic to or from an end user. Now, notably, if you accept Great Lakes' interpretation, it requires you to rewrite the rule and insert the word directly, but that's not how the rule is crafted. The commission deliberately adopted a broader definition, which encompassed intermediate carriers that provide some interstate exchange access services used to send traffic to or from an end user, and that's made explicit by the language in the Eighth Report and Order, where the commission concluded that we're adopting a new rule to apply to intermediate carriers, and we said that the rates that a competitive let charges for access components when it's not serving the end user must be higher, should be no higher, than the rate charged by the competing ILET. And Great Lakes notably does not even address that language, either in their brief or in their reply. What does it mean to serve an end user? I mean, anyone who provides intermediate services, I mean, the whole point of the phone line is that it's connecting some user on one end to the user on the other end. So wouldn't there always be some end user who's being served by your services? I mean, why do you even need the word served? I mean, if you just are providing intermediate services, then I guess I don't understand how the definition that you're pressing upon us adds anything or gives any meaning to that phrase. Well, the language in 6126A1 does not use the term serve. It says used to send traffic to or from an end user and does not fall within the definition of an incumbent local exchange carrier. So here, intermediate carriers like Great Lakes, they transport traffic. So here, the traffic was aggregated. It was handed off to LECME, which operates an end office switch in Southfield, Michigan. And from there, the traffic was handed off to Great Lakes' tandem switch in Westphalia. Great Lakes then directed the traffic to AT&T to complete the call. So Great Lakes was in the middle of this chain of transporting traffic, but they did not terminate or originate traffic. But that's because 6126A1 doesn't use the term serve, but it uses the term services. And it says interstate exchange access services used to send traffic to or from an end user. So I guess your point is that you can be engaged in services used to send traffic to or from an end user at the higher level of an intermediate carrier, but you're not then serving, i.e., terminating traffic to or originating traffic from any end user within the meaning of the language of the rural exemption, that the first one is one level of generality higher than directly serving end users. Is that what? That's correct, Your Honor, and that's made clear by the language in the eighth report in order where we say that the benchmark rule applies even to those that don't directly serve the end user. Do you just have a quick question? In the reply brief, Great Lakes asked us to vacate the part of the discussion dealing with the statute of limitations. I understood your brief to say nothing the commission has said so far prejudges the question of how much of this period of time is actually covered under the statute, right? That's an open question. That's correct, Your Honor. AT&T bifurcated the liability and damage claims in the complaint, but the damages phase has not yet occurred. The commission has not ruled on this issue. So that question is totally open on remand, right? That's right, but this will be determined at the damages phase. Okay, thank you. Thank you very much. We ask that the court affirm the commission's order. Okay, thanks. Good morning, Your Honors. May it please the court, I'm Michael Hunseter. I'm representing my client, AT&T, and the other interveners. I'd like to focus this morning on the rural exemption, most particularly here. First, we agree clearly with the textual analysis in the order and the FCC's counsel just explained that this is an F case. And the commission explained, not just in footnote 96, but in the order in paragraphs 20 to 21, it said, look, when we first promulgated this benchmark rule, it didn't address intermediate care. So it didn't intentionally exclude it, just we didn't think about it at the time. And all of a sudden then there was a bunch of controversies about how to treat intermediate C-levels. So they adopted what they said in 2004, a new rule. And the first clause of subsection F clearly says if you're a C-level and you're providing some of the services, then this is the rule that you're subject to, subsection F. This is a subsection F case. It's not a rural exemption case for many reasons. And the evidence is overwhelming. On the textual issue, it's not an E case because, again, one, it's not the rural exemption is an exemption from B through D, not F. And, indeed, it would make no sense to interpret it any other way because essentially what the commission would be saying in F is, well, if you're a C-level and you serve some end users, but sometimes you operate as an intermediate C-level, when you're operating as an intermediate C-level, you're clearly subject to F. So let me ask you, from your perspective as AT&T, when you read the commission's order and the commission's order then goes on to talk about particular attributes of this CLEC that render it non-rural, was your question, well, why are we talking about that at all? Well, no, I think it was our duty as the complainants to bring all the evidence to bear on why we were being overcharged by the petitioners under this rural exemption. And the FCC, when it put in place the rural exemption in 2001 and when it reaffirmed it exactly as it had written in 2001 and 2004, it clearly said, look, the rural exemption is very narrow. And it's only the reason we're doing it is because the people that are serving the rural end users in the rural areas have these high loop costs. Loop costs are the lines that connect the LEC to the end user. So that was the entire purpose of the rural exemption. And so obviously, I mean, again, in 2001, they weren't thinking about rural exemption. They were thinking about rural exemption, not intermediate carriers. And then when they add F, it's clear that F applies to the intermediate carriers only, and the rural exemption is only designed for those rural carriers serving the end users. And there's no other purpose for. And where do we find that analysis in the order we're reviewing? Well, I think in the order where it is, again, it's saying that this is F case in 20 to 21. But in the discussion of why the rural exemption does not apply here, the commission just gives two reasons. One is that they have facilities in Chicago, right? That's one reason. Right. And the other reason is that by definition, at least some of the end users must be urban. Right. I'm sorry. But that sounds to me like this particular intermediate carrier does not qualify for the rural exemption. And that's the analysis that's before us. No. And I think, though, they also did say in the footnote 96 that if you are an intermediate CLEC that serves no end users, you can never be a rural CLEC. So I think they said that. But then in response to Judge Srinivasan's question, like I said, as complainants, we felt obliged, and indeed the commission's rules obliged you as a complainant to bring all of the evidence. Right. So I'm not suggesting that it wasn't incumbent upon you or didn't behoove you to introduce all the evidence you possibly can to say, look, these folks, they serve urban users in some measure. I don't deny that I would have done that, too. I guess my question, though, is just as a matter of analytical approach. If there is this threshold categorical rule that says that intermediate carriers just don't fit within the rural exemption period, then it just going on to explain why this particular intermediate carrier does serve urban users, I mean, maybe it adds color to some extent, but it's just analytically beside the point. I think it adds color. Again, as complainants, we don't know which of the rationales of many rationales. We understand exactly why you argued it the way you did. We're asking you an administrative law question from our perspective. We have to decide whether the order we're reviewing satisfies the Administrative Procedures Act. Correct. And your answer is we can rely on footnote 96, right? You can rely on footnote 96. You can rely on the text of the regulation that was applied to GLC, and you can rely on the clear evidence. I mean, it's JA 370. That's a map of this petitioner's facilities. The map shows there are facilities in Chicago. It's in Ann Arbor. It's in Grand Rapids, all urban areas. And again, when you read the rules and the order that promulgated the rural exemption, it's impossible. I guess the question is, though, if you're an intermediate carrier out there and you want to figure out whether you fit within the rural exemption, okay, then that matters to you because it affects rates. So you're trying to assay everything that you can see to get a read on whether you qualify. You look at the order and you think, well, I better take a look at where my transit facilities are located. And then it turns out, I think, that that doesn't matter, actually, because the fact that you're an intermediate carrier just renders you categorically ineligible for the rural exemption at all. So that's the question about the way the order is framed, that there may be things that are in there that are extraneous, and somebody who is well-versed in this would understand that they're extraneous. Well, and I think the people that are reading those rules are particularly well-versed in this, to be honest, and I do think that you're correct that, you know, again, it's incumbent upon the LEC if they want to file a tariff. And again, they don't have to file tariffs. They can always negotiate a contract with us. They didn't do that because they wanted, in our view, to abuse the rural exemption scheme. But if they want to file a tariff, you know, they have to read the rules and the promulgating orders. And like I said, I think in this case there's overwhelming evidence. And like I say, I understand your point that, yeah, they could have stopped at .1, and perhaps that would be more definitive. But again, when they promulgated those orders in 2001 and 2004 about the rural exemption, they also said that the service area does matter. And so I think if you're a CLEC trying to figure out, well, am I subject to the rural exemption or not, you obviously would want to read. I mean, these are orders that were issued after notice and comment rulemaking. Well, the service area definitely matters if you directly serve end users. The point is that if you're an intermediate carrier, by definition, you're not directly serving end users, and therefore the rural exemption just isn't even in play. No, right. I think that's right. And I think, frankly, this order will help clarify that. But at the same time, I don't think that nor does it eliminate the need to look at your service territory either. Okay. Thank you for your time. Thank you. Council, any time left? You can take two minutes if you'd like. I used up most of your time with my question about 800 calls. You can have your two minutes back. That's quite all right. With respect to the arguments that have been made about subsection F of Rule 6126, I wanted to make a couple of observations. First of all, the argument that subsection F is a justification for excluding intermediate carriers from the definition of a rural carrier begs the question of what's a SELEC in the first place, because subsection F says SELECs which provide only a portion of the service. So we have to start with the question of are you a SELEC within the scope of 6126 to start with. Secondly, as the FCC and AT&T, the other interveners, are basically misapplying subsection F entirely. It is absolutely clear from the eighth report in order, including in particular Commissioner Powell's statement in that order, that what that was intended to address was that there were some carriers who were only providing a portion of the services covered by the benchmark rule, but were charging the full benchmark rate. And the purpose was to say if you're only providing a portion of the service, you can only charge a portion of the benchmark. Secondly, to underscore how arbitrary and capricious the FCC's order is, in paragraph 29 it says Great Lakes Tariff was void ab initio when filed because it violated subsection F. GLC's tariff was filed two years before subsection F was adopted. It can't possibly have violated a rule adopted two years later and given perspective force only. Thank you. Thank you, Your Honor. Case is submitted. Thank you.
judges: Tatel, Srinivasan, Wilkins